**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

BETH BERAROV and ANNELISA BINDRA,
Individually, and on behalf of all others similarly situated,

      Plaintiffs/Class Representatives,

v.                                       No. _____

ARCHER-DANIELS-MIDLAND COMPANY, and
ADM ALLIANCE NUTRITION, INC.,

      Defendants.

**CLASS ACTION COMPLAINT AND JURY DEMAND**

**Introduction**

1.      The Illinois-based agricultural conglomerate Archer-Daniels-Midland Company, through its subsidiary ADM Alliance Nutrition, Inc. (collectively, "ADM"), is one of the world's largest manufacturers of animal feed. To cut costs, ADM manufactures horse feed products at facilities that also produce cattle feed containing monensin, a chemical additive used to increase weight and market value in cattle.

2.      While it may be useful in the cattle business, monensin is poisonous to horses — a fact well-known to ADM.

3.      For this reason, ADM's choice to manufacture horse feed and supplements in the same facility as monensin-laced cattle feed (a so-called "cross-species facility") poses an extraordinarily high, unacceptable, and undisclosed risk of cross-contamination to purchasers of its horse feed products.

4.      The harm to purchasers caused by this risk of cross-contamination is exacerbated by the inability of modern veterinary medicine to determine whether a living horse has ingested monensin. Monensin poisoning is generally only detectable in a live horse within a few days of

consumption; after that, it usually cannot be detected until the horse is dead and a necropsy is performed. Harm to horses that ingest monensin sometimes occurs gradually, depending on the level of exposure, as monensin destroys a horse's heart fibers, creating a potential for sudden and unexpected heart failure that jeopardizes the lives and safety of both horse and rider.

5.     Plaintiffs Beth Berarov and Annelisa Bindra are horse owners who, based on ADM's misrepresentations and omissions about the safety of its horse feed and supplements, unknowingly purchased monensin-contaminated feed and supplements. Several of their horses died as a result, and others were euthanized because of their exposure to monensin. Those horses that have survived cannot safely be ridden or worked because of their weakened hearts.

6.     Plaintiffs bring this action on their own behalves and on behalf of a class of ADM horse-feed purchasers, and seek both damages and prospective relief. As damages, Plaintiffs seek a full refund of the purchase price of ADM's feed, and compensation for harms caused by monensin contamination. Prospectively, Plaintiffs seek to require ADM to notify all past purchasers about the potential for harm caused by its monensin-contaminated horse feed, and either to require ADM to change its manufacturing processes to eliminate the risk of monensin contamination, or, alternatively, to require ADM to disclose to purchasers that its feed and supplements are manufactured in facilities creating a high risk of contamination.

**Parties**

7.     Plaintiff Beth Berarov is a Michigan resident. She purchased ADM products contaminated with monensin for her own horses, and for others entrusted to her care.

8.     Plaintiff Annelisa Bindra is a South Carolina resident. She purchased and/or used ADM products contaminated with monensin for her horse.

9. Defendant Archer-Daniels-Midland Company is a worldwide food processing corporation. It is incorporated in Delaware, with a principal place of business in Chicago, Illinois.

10. Defendant ADM Alliance Nutrition, Inc. is a wholly-owned subsidiary of ADM. It is an Illinois corporation with a principal place of business in Quincy, Illinois. ADM produces, manufactures, advertises, distributes, and markets equine feeds and nutritional supplements through Alliance Nutrition.

## Jurisdiction and Venue

11. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because at least one class member is a citizen of a state different from the Defendants, there are over 100 class members, and the matter in controversy exceeds the sum or value of $5 million.

12. Venue is proper here under 28 U.S.C. § 1391 because (a) the Defendants have manufactured for sale, marketed, advertised and sold equine feed and nutritional supplements in this district; (b) a substantial part of the events, misrepresentations, deceptive practices, omissions and injuries giving rise to the claims occurred in this district, and (c) conduct that is the subject of the lawsuit occurred in this district.

## Facts

**A.      Monensin is poisonous to horses, even in small amounts.**

13. Monensin is an antibiotic growth promoter used as an inexpensive, highly effective growth-enhancing feed additive for beef and dairy cattle, and also to treat internal parasites in poultry and other livestock.

14.     While over-concentrations of monensin in livestock can be fatal, and monensin is toxic to humans and requires the use of protective clothing and a respirator, monensin is poison to horses.

15.     Monensin toxicity in horses causes myocardial necrosis, or the death of heart cells and tissue. The ingestion of monensin causes equine heart failure and other major organ damage.

16.     Harm to horses that ingest monensin often is difficult to detect and frequently occurs gradually, depending on the level of exposure, as monensin damages a horse's heart, creating a potential for sudden and unexpected heart failure that jeopardizes the lives and safety of horses, riders, and others who work with and around them.

17.     The danger monensin poses to horses is well-known. For example, the United States Food and Drug Administration requires that livestock feeds containing monensin bear the following warning on its packaging: "Do not allow horses or other equines access to feed containing monensin. Ingestion of monensin by horses has been fatal." 21 C.F.R. § 558.355(d)(6).

18.     The FDA also recognizes the particular risk of cross-contamination of medical additives in animal feed:

> Where drug carryover from the manufacture of medicated feed results in unsafe contamination in other feeds, it constitutes a violation of the good manufacturing practice regulations (21 CFRa). The feeds are adulterated within the meaning of 501(a)(2)(B) of the Act. The adulteration of non-medicated feed with unsafe contamination is likewise a violation of [good manufacturing practice regulations] (21 CFRb).[1]

19.     Controlled studies of the exact lethal dose of monensin poisoning in horses would lead to the death of their subjects, and there are few such studies. One report has estimated that a

---

[1] United States Food & Drug Admin. Consumer Policy Guide § 680.500, Unsafe Contamination of Animal Feed from Drug Carryover, http://www.fda.gov/ICECI/ComplianceManuals/CompliancePolicyGuidanceManual/ucm074699.htm.

dose as small as 1.38 milligrams per kilogram of body weight would kill half the test population. Field observations indicate that consumption of even smaller amounts of monensin is lethal to horses.[2]

20.    Symptoms of monensin poisoning in horses include colic, incoordination/ataxia, muscle weakness/paresis, elevated heart rate, dark urine, kidney failure, respiratory distress, depression, paralysis with anorexia, and intermittent profuse sweating.

21.    While these symptoms may be vague and difficult to detect in a live horse exposed to monensin, ingestion of the chemical causes permanent cardiac and skeletal muscle damage in horses — typically so severe that an affected horse cannot safely be worked or ridden again.

22.    This means that horse owners, who typically purchase horses to ride or work them, cannot safely do so if their horse has ingested any amount of monensin. There is no antidote for monensin poisoning, and treatment cannot cure it, as the damage to the heart is irreversible.

**B.    Despite its knowledge of the risk of cross-contamination, ADM manufactures horse feed and supplements in cross-species facilities that also manufacture cattle feed with added monensin.**

23.    Cross-contamination of animal feed occurs when one type of feed processed in a feed mill remains in the production line and mixes with other types of feed produced in the same mill.

---

[2] European Food Safety Authority, Cross-Contamination of Non-Target Feeding stuffs by Monensin Authorized for Use as a Feed Additive, Scientific Op. of the Panel on Contaminants in the Food Chain, at 25, Nov. 26, 2007, http://www.efsa.europa.eu/sites/default/files/ scientific_output/files/main_documents/contam_op_ej592_monensin_en,3.pdf.

24.     The risk of cross-contamination in multi-species feed mills can be reduced, but not eliminated. Therefore, if a feed mill produces cattle or other feed containing monensin, and also produces horse feed, some quantity of monensin will end up in the horse feed.

25.     To avoid the risk, other manufacturers use equine-only feed processing facilities, or manufacture horse feed in cross-species facilities that do not use monensin in livestock feed.

26.     To cut costs and increase profits, ADM, which knows of the risks of cross-contamination, manufactures horse feeds and supplements in feed mills that also produce animal feed with added monensin. These ADM feeds (collectively, the "Products") may include, but are not limited to, GROSTRONG vitamin-Mineral products; JUNIORGLO, PRIMEGLO, SENIORGLO and POWERGLO premium blend equine feeds; ULTRA-FIBER and PATRIOT fortified equine feeds; and MOORGLO and HEALTHY GLO premium high fat supplements.

**C.     Because ADM knows that horse owners wish to purchase safe and healthful feeds and supplements, ADM misrepresents the Products' safety and healthfulness, fails to disclose the risks posed by its manufacturing processes, and misleads customers.**

27.     ADM has spent millions of dollars to build the trust and confidence of those who purchase its products.

28.     ADM knows that horse owners wish to purchase safe and effective horse feeds and supplements.

29.     Despite this knowledge, ADM makes misleading, false, and deceptive statements in its promotional materials and packaging, and it fails to disclose that the Products are manufactured through processes creating an unacceptably high risk of monensin contamination.

30.     In print advertisements, ADM claims that its horse feed and supplements are healthy, formulated for the specialized needs of horses, purchased by concerned and successful

6

horse owners, and consumed by exceptionally healthy horses. ADM uses the misleading, false, and deceptive tagline, "Doing what's right for the horse." (Ex. 1.)

31.     On its websites, ADM makes similarly misleading and deceptive assertions, and fails to disclose the risks of its manufacturing processes:

a.     "Based in Quincy, Ill., ADM Alliance Nutrition offers consistent, high-quality feed products, supplements, premixes, custom ingredient blends and feed ingredients to help livestock producers achieve the greatest possible return from the grain and forage they utilize in livestock production."

b.     "Each ADM product is specifically created to help producers meet the nutritional demands of modern livestock while balancing environmental concerns."

c.     "ADM Alliance Nutrition's research-based FORAGE FIRST feeding programs that minimize forage and include feeds and supplements with minerals, vitamins, healthy fats and proteins combined for each horse specific requirements allow horses to perform at their best with less risk of digestive and metabolic disorders associated with high-grain rations."

d.     "ADM Alliance Nutrition Equine Research is dedicated to developing the most effective equine feeding programs with the best value for horse owners."

e.     "Horse owners know that sound nutrition is one of the keys to longevity and performance."

f.     "ADM can deliver complete feeds, premixes or nutritional supplements – whatever makes the most sense for the family pleasure horse or the equine athlete."

g.     "ADM offers a number of ingredients for the horse feed manufacturer that enable horses to live long and healthy lives."

(Exs. 2 and 3.)

32.     ADM's press releases downplay the lethal nature of monensin contamination, and further mislead the public about the nature and quality of the Products.  (Ex. 4.)

33.     In a release generated in response to reports about the monensin-related deaths of horses at Camelot Farms, where Plaintiff Bindra stabled her horse, ADM stated unreservedly and in bold print, **"Generations of healthy, winning horses have shown that horse feed produced in multi-species facilities is safe.**" (Ex. 5.) This statement is materially false and misleading, and omits material facts regarding the danger of monensin cross-contamination.

34.     This release is replete with other materially misleading statements, false statements, and omissions, including:

    a.     "When monensin-treated cattle feed is manufactured in the same facilities as horse feed, trace residues of monensin can be found in the horse feed. These levels are far below levels that are harmful to horses." While it is true that cross-contamination will occur in cross-species mills, the so-called "trace residues" are harmful to horses and, in fact, harmed or killed the Plaintiffs' horses.

    b.     "Studies show that a 1000-pound horse can safely consume about 318 parts per million (ppm) in 30 pounds of feed."  A concentration of 318 ppm in 30 pounds of feed works out to 4326.5 mg consumed by the horse, or a dose of 9.5 mg/kg of body mass.  This is nearly 5 to 10 times the published LD 50 of 1-2 mg/kg. So, when ADM says that horses can "safely consume" 30 pounds of feed containing 318 ppm of monensin, it actually saying that a horse can eat an indisputably lethal dose of monensin.

35.     Further, the press release is internally inconsistent. The next section references monensin-detection limits of "1.0 ppm or 1.47 g/ton." Besides the mathematical fact that 1.0

ppm actually equals 0.907 g/ton, the next statement that "[a]t these levels, an average 1000-pound horse would have to eat 893 pounds of feed a day to consume a lethal level of monensin" is inconsistent because it suggests that 404 mg of monensin would kill a 1000 pound horse, instead of the 4326.5 mg it stated a few lines earlier in the same document.

36.     In addition, the statement that "[a]t these levels, an average 1000-pound horse would have to eat 893 pounds of feed a day to consume a lethal level of monensin" is materially false and misleading. It does not mention any harm to the horse short of immediate death, and no rational veterinarian would ever suggest that a horse could consume anywhere near 400 mg of monensin a day and not suffer ill effects, or death.

37.     ADM intended the Plaintiffs, class members, and the public to rely on these and other materially false and misleading statements.

**D.     ADM knew or should have known that its representations were false.**

38.     ADM knew the representations it made on its labels, in its advertising, and in its promotional materials.

39.     It also knew how the Products were manufactured, and that its processes created an unacceptably high risk of monensin contamination and equine death.

40.     ADM knew that purchasers lack the information necessary to determine whether the Products are manufactured safely and through processes that do not generate the presence of, or the potential for the presence of, monensin.

41.     ADM knew all the facts demonstrating that the Products were falsely and misleadingly advertised, and that it had a duty to disclose and warn purchasers about its high-risk manufacturing methods and the Products' potential or actual contamination with monensin.

E. **ADM intended for consumers to rely on its misrepresentations and omissions about the Products.**

42. ADM made the above false, deceptive, and misleading representations and omissions intending for Plaintiffs and class members to rely upon them in purchasing the Products.

43. In making these false, misleading and deceptive representations and omissions, ADM knew and intended that consumers would purchase ADM horse feed and supplement products when consumers would otherwise purchase a competing product.

44. Purchasers are not only willing to pay more for a product that purports to be safe and trustworthy, they expect that product to be safe and not contain contaminants that can cause death.

45. No reasonable purchaser seeing ADM's representations would expect the Products to be manufactured through processes that create an unacceptably high risk of monensin-contamination and equine death.

46. In making these false, misleading and deceptive representations and omissions, ADM also knew and intended that consumers would pay more for safe, trustworthy horse feed and supplements, furthering ADM's interest in increasing sales of its products and decreasing the sales of products manufactured without risk of monensin-contamination by its competitors.

F. **Consumers reasonably relied on ADM's misrepresentations.**

47. Consumers rely on label representations and information in making purchasing decisions.

48. When Plaintiffs and class members purchased the Products, they relied on ADM's representations and omissions, and did not receive disclosure of the presence of monensin or the risk of monensin contamination inherent in ADM's manufacturing processes.

49. Plaintiffs and class members were among the intended recipients of ADM's deceptive representations and omissions.

50. Plaintiffs and class members reasonably relied to their detriment on ADM's misleading representations and omissions.

51. ADM's false, misleading, and deceptive misrepresentations deceived and mislead, and are likely to continue to deceive and mislead, Plaintiffs, class members, reasonable consumers, and the general public.

52. ADM's misleading affirmative statements further obscured what it failed to disclose, and the warnings it failed to give. Thus, reliance upon ADM's misleading and deceptive representations and omissions may be presumed.

53. ADM made the deceptive representations and omissions with the intent to induce Plaintiffs and class members to purchase the Products. Plaintiffs' and class members' reliance upon the representations and omissions may be presumed.

54. ADM's deceptive representations and omissions are material in that a reasonable person would attach importance to that information and would be induced to act upon that information in making purchase decisions. Thus, Plaintiffs' and class members' reliance upon the representations may be presumed as a matter of law; the representations and omissions were material; and a nexus exists between ADM's conduct, on the one hand, and Plaintiffs' and class members' decisions to purchase the Products at a certain price, on the other hand.

**G.  ADM's conduct harmed Plaintiffs and class members.**

55. As an immediate, direct, and proximate result of ADM's false, misleading, and deceptive misrepresentations and omissions, ADM injured Plaintiffs and class members in that they:

11

    a.    paid a sum of money for a product that was falsely represented;

    b.    paid a sum of money for a product containing monensin or a high risk of monensin contamination, for which they received no warning;

    c.    paid more for a product that was falsely represented than they would have paid had the product not been falsely represented;

    d.    were deprived the benefit of the bargain because the Products they purchased were different from what ADM warranted;

    e.    were deprived the benefit of the bargain because the Products they purchased had less value than what was represented;

    f.    did not receive a product that measured up to their expectations as created by ADM;

    g.    fed their horses a substance that was other than what was represented and that was undisclosed;

    h.    fed their horses a substance they did not expect or consent to;

    i.    fed their horses a product that included a deadly substance;

    j.    without their knowing consent, fed their horses a substance that is harmful to the horses' health, and harmful to the health of persons who ride or work with them;

    k.    without their knowing consent, fed their horses a substance that was manufactured through processes that create an unacceptably high risk of equine death;

    l.    without their knowing consent, fed their horses a substance that was of a lower quality than what ADM promised;

    m.    were denied the benefit of knowing what their horses ingested; and

n.    were denied the benefit of supporting an industry that safely manufactures horse feed and supplements through processes that create safe products.

56.    Had ADM not made the false, misleading, and deceptive representations and omissions, and had ADM not failed to warn about its manufacturing process and the presence of monensin in the Products, Plaintiffs and class members would not have been harmed as listed above.

57.    Plaintiffs and class members all paid money for the Products, but did not obtain the full value of the advertised products because of ADM's misrepresentations and omissions. Plaintiff and class members purchased, purchased more of, or paid more for, the Products than they would have had they known the truth about the Products.

**H.    ADM benefited from its misleading representations and omissions.**

58.    As the intended, direct, and proximate result of ADM's false, misleading, and deceptive representations and omissions, ADM has been unjustly enriched through more sales of the Products and higher profits at the expense of Plaintiffs and class members.

59.    As a direct and proximate result of its deception, ADM also unfairly obtained other benefits, including the higher value associated with a safe and trusted brand, redirecting sales to it and away from its competitors.

60.    Plaintiffs and class members did not bargain for products that contain monensin or were manufactured through high-risk processes in exchange for their payment of the purchase price.

61.    ADM has profited by failing to warn consumers of its manufacturing processes and the high-risk of and actual contamination of the Products.

62. ADM has failed to provide adequate relief to the Plaintiff or class members as of the date of filing this Complaint.

63. The Products were sold through unfair and unconscionable trade practices because the sale of the Products offends public policy and is immoral, unethical, oppressive, unscrupulous, and caused substantial economic injuries to Plaintiffs and class members.

64. Reasonable consumers do not expect horse feed and supplements held out as safe and trustworthy to contain monensin, or to be manufactured using processes creating an unacceptably high risk of contamination.

65. ADM's statements and other representations convey a series of express and implied claims and omissions which ADM knows are material to the reasonable consumer in making a purchasing decision, and which ADM intended for consumers to rely upon when choosing to purchase the Products.

66. Defendant misrepresented the nature, quality, and ingredients of the Products, and failed to adequately disclose the health risks of ingesting the Products, which was and is false, misleading, and likely to deceive reasonable consumers.

67. Reasonable consumers expect the presence of such risks to be disclosed so that they can make informed purchasing decisions.

68. Therefore, the Products are valueless, not worth the purchase price that Plaintiffs and class members paid for them, and are not what Plaintiffs and class members reasonably intended to receive.

I. **Plaintiff Beth Berarov's horses became ill and were euthanized because they consumed contaminated ADM feed and supplements.**

69.    Plaintiff Beth Berarov owns and operates Moonlyte Equestrian Center in Carleton, Michigan. At relevant times during the class period, she owned 13 horses, and was responsible for caring for six others, all stabled at Moonlyte.

70.    Ms. Berarov has purchased ADM feed and supplements for years. During the class period, she purchased her entire platform of equine feeds and nutritional supplements from ADM, and her horses were exclusively fed or administered these products.

71.    In March 2015, Ms. Berarov discovered that several of her horses were becoming ill, with symptoms including "tying-up" after little or no exertion, tachycardia, backline deformities, irritability, lethargy, and severe weight loss.

72.    Over time, every horse stabled at Moonlyte experienced one or more of these symptoms.

73.    To investigate the cause, Ms. Berarov had her ADM feed products analyzed. This analysis revealed that the ADM products she had fed her horses were contaminated with monensin.

74.    Ms. Berarov also filed a complaint with the Pesticide and Plant Pest Management Division of the Michigan Department of Agriculture and Rural Development. On February 26, 2016, the Department concluded that sufficient evidence indicated supported her allegations that the ADM Seniorglo Horse Feed she fed her horses was adulterated with monensin.

75.    On March 10, 2016, one of the horses Ms. Berarov cared for at Moonlyte, "Dannon," a 10-year-old gelding, was euthanized because of his exposure to ADM's monensin-contaminated products.

76.     Dannon's post-mortem necropsy was performed at Michigan State University's Diagnostic Center for Population and Animal Health. The report diagnosed chronic cardiac damage, including "degenerative cardiac lesions . . . most consistent with chronic monensin toxicity." (Ex. 6.)

77.     After Dannon was euthanized, eight other horses owned by Ms. Berarov were euthanized because the Products were laced with monensin. Necropsy reports for these horses also revealed permanent cardiac and skeletal muscle damage as a result of ingesting the Products. (Exs. 7-14.)

**J.      Plaintiff Bindra's horse and other horses became ill and died because they consumed ADM horse feed contaminated with monensin.**

78.     Plaintiff Annelisa Bindra stabled her horse, "Dakota," at Camelot Farms, a Beaufort, South Carolina equestrian center.

79.     On December 14, 2014, Dakota and another horse stabled at Camelot Farms began exhibiting signs of colic, dehydration, and other digestive problems as a result of ingesting ADM's monensin-contaminated products—specifically, ADM Alliance 12% Pellets and Patriot 12% Supreme Performance Horse Feeds.

80.     Over the next three days, the two horses' continued to deteriorate. They died on December 16, 2014.

81.     On December 17, 2014, a third horse at Camelot Farms began exhibiting symptoms of colic and toxicity related to its exposure to monensin from the Products.  This horse died on December 19, 2014.

82.     Between December 17, 2014 and December 28, 2014, two other horses experienced severe and irreversible health complications from their exposure to monensin.

83. Shortly thereafter, the owners of Camelot Farms sent the ADM Alliance feed for testing. The testing revealed that the ADM feed contained monensin. *See* Report of Feed Analysis, attached as Ex. 9. This feed, which killed several horses in a matter of days and permanently injured the others, contained monensin at the level of greater than 2 parts per million.

84. As a result of ADM's conduct, Ms. Berarov, Mrs. Bindra, and Class members have suffered economic losses including, but not limited to, the market value and the actual value to the owner of the horses, the purchase price of the Products, and veterinary and related medical expenses.

85. Plaintiffs and class members purchased the Products from the Defendants and (a) relied upon and trusted the Defendants' representations and omissions in purchasing the Products; (b) would not have purchased the Products had they known the truth about the nature, character, quality, ingredients, and harmful effects of the feeds and supplements; (c) did not receive a benefit from the purchase of the Products because in reality, such goods were materially different from what was advertised; and (d) their horses suffered permanent illness and death as a result of ingesting the Products as described more fully below.

86. The Named Plaintiffs bring this action for injunctive relief, restitution, and damages for (1) false and deceptive advertising, misrepresentations, and omissions made by the Defendants in the marketing, manufacturing, advertising, and sale of the Products; and (2) for the illnesses and deaths of horses owned by Plaintiffs and class members that ingested the Products.

**Class Action Allegations**

87.     Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class defined as all persons who purchased ADM equine feeds and nutritional supplements within any applicable limitations period until notice is provided (the "Class Period").

88.     Excluded are Defendants and Defendants' officers, directors and employees; any entity in which Defendants have a controlling interest; the affiliates, legal representatives, attorneys, heirs and assigns of the Defendants; and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staffs.

89.     All class members are similarly affected by ADM's conduct, and the relief sought in this complaint is for the benefit of Plaintiff and class members.

90.     Based on annual sales of the Products, individual joined of all class members is impracticable, if not impossible.

91.     Questions of law and fact are common to the class and predominate over any questions affecting only individual members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of the litigation:

        a.      Whether the Defendants made representations regarding the safety and quality of the Products they produced and sold;

        b.      Whether the representations Defendants made regarding the safety and quality of the Products were true;

        c.      Whether by their misconduct as set forth herein, Defendants have engaged in unlawful or fraudulent business practices;

        d.      Whether the Defendants breached an express warranty;

18

      e.    Whether the Defendants breached an implied warranty of merchantability;

      f.    Whether Plaintiffs and class members have been damaged;

      g.    Whether the Products were "adulterated;"

      h.    Whether the Defendants complied with all labeling requirements required by law;

      i.    Whether the Defendants violated Illinois law; and

      l.    Whether Illinois law applies to all class member claims.

92.    Plaintiffs' claims are typical of the class members' claims. Plaintiffs have no interests antagonistic to those of the class.

93.    Plaintiffs will protect class members' interests fairly and adequately, and have retained attorneys experienced in class action litigation.

94.    A class action is superior to all other available methods for this controversy because (i) the prosecution of separate actions by class members would create a risk of adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; (ii) the prosecution of separate actions by class members would create a risk of inconsistent or varying adjudications with respect to the individual class members, which would establish incompatible standards of conduct for Defendants; (iii) Defendants acted or refused to act on grounds generally applicable to class members; and (iv) questions of law and fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

95.     Plaintiffs do not anticipate any undue difficulty in the management of this litigation.

## Legal Claims

### First Claim:
### Breach of Illinois Food, Drug, and Cosmetic Act

96.     Plaintiffs and class members purchased the Products based on the implied understanding that these products were safe for their horses to consume.

97.     Plaintiffs and class members are "Persons" as defined by 410 ILCS 620/2.1.

98.     The Products are "Food" as defined under 410 ILCS 620/2.3 in that the Products are "articles used for food or drink for man or other animals."

99.     The Products are "adulterated" because they bear or contain a poisonous or deleterious substance which may render them injurious to health. 410 ILCS 620/10.

100.    The Products are "contaminated with filth" because they are not securely protected as far as may be necessary by all reasonable means, from all foreign or injurious contaminations. 410 ILCS 620/2.15

101.    The Products are "misbranded" as defined under 410 ILCS 620/2.11 because the labeling or advertisement of the Products:

        a.      Is misleading in light of the representations made or suggested by statement, word, design, device, sound, or any combination thereof;

        b.      Fail to reveal material facts in the light of the representations made or suggested by statement, word design, device, sound, or any combination thereof; and

        c.      Fail to reveal material facts with respect to the consequences which may result from the use of the Products to which the labeling or advertisement related under the

conditions of use prescribed in the labeling or advertisement thereof or under such conditions or use as are customary and usual.

102.    The Products were not safe for horses to consume and have caused horses to become ill and die after consumption.

103.    ADM's sale of the Products violates one or more enumerated acts prohibited under the Illinois Food, Drug and Cosmetic Act, including but not limited to:

   a.    The manufacture, sale, delivery, holding, or offering for sale any food that is adulterated or misbranded;

   b.    The adulteration or misbranding of any food;

   c.    The receipt in commerce of any food that is adulterated or misbranded and the delivery or proffered delivery thereof for pay or otherwise; and

   d.    The dissemination of any false advertisement.

104.    As a direct and proximate result of ADM's wrongful conduct and violations of the Illinois Food, Drug, and Cosmetic Act, Plaintiffs and class members have suffered damage in an amount to be proven at trial.

### Second Claim:
### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act

105.    Defendants are "person[s]" as defined by 815 ILCS 505(c).

106.    Plaintiffs and class members are "consumers" as that term is defined by 815 ILCS 505/1(e).

107.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the

concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

108. ADM has violated the Illinois CFA by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers. Specifically, ADM has misrepresented the true nature, quality, and ingredients of the Products and failed to adequately warn of and disclose the presence of monensin in the Products and the health effects to horses in ingesting monensin, thereby disseminating representations or omissions that are false, deceptive, and likely to mislead a reasonable consumer, such as Plaintiffs and class members.

109. ADM misrepresented and omitted facts about the presence of monensin in the Products and the health effects on horses that ingest monensin, which were and are material to Plaintiffs and class members' decisions to purchase the Products.

110. ADM's sale of the Products is an unfair method of competition, unconscionable act and practice, and an unfair and deceptive act and practice in the conduct of its business.

111. Plaintiffs and class members suffered ascertainable loss and actual damages as a direct and proximate result of ADM's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and class members who purchased the Products would not have purchased them at all and – if the true nature of the contents of the Products had been disclosed – would have paid significantly less for them.

112. ADM's conduct offends established public policy, and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

113.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices affected the public interest.

114.    As a direct and proximate result of Defendants' violations of the Illinois CFA, Plaintiffs and class members seek monetary relief against ADM in the amount of actual damages, as well as punitive damages because ADM acted with fraud and malice and was grossly negligent.

### Third Claim:
### Negligent Misrepresentation

115.    ADM owed Plaintiffs and Class members a duty to exercise care representing the safety of the Products. ADM advertised, labeled, packaged, marketed, distributed, and sold the Products without adequately warning Plaintiffs and class members of the presence and potential presence of monensin in the Products and the health effects to horses that ingest monensin on media such as on the Products' packaging and labeling.  Further, ADM represents that the Products are safe for consumption by horses despite the potential for cross contamination and the presence of monensin.

116.    ADM was negligent in making misrepresentations and omissions that its equine products were safe for consumption by horses because they knew, or should have known, that the Products contain or potential contain monensin.

117.    Plaintiffs and class members reasonably relied upon the misrepresentations and omissions provided by ADM regarding the safety of the Products.

118.    The factual misrepresentations and omissions committed by ADM were material to Plaintiffs and class members in making their purchases of the Products.

119.    As a proximate cause of ADM's factual misrepresentations and omissions, Plaintiffs and class members suffered injury, specifically in the illness and deaths of their horses and associated expenses, in an amount to be proven at trial.

**Fourth Claim:**
**Strict Products Liability**

120.    Defendants, as set forth above, are manufacturers and distributors of the Products.

121.    The Products are defective in design and manufacture in that they contain an ingredient or ingredients that are harmful to horses upon consumption.  The Products are further defective because of inadequate testing, and inadequate warnings specific to monensin. Defendants knew that the Products would be purchased and used without inspection, or testing for defects and harmful substances by the purchaser.

122.    Further, the Products were under the exclusive control of the Defendants and was sold without warning as to the specific health risks associated with these products.  ADM had a duty to warn purchasers of the health risks associated with the Products in an effective manner. Such warnings should have been placed on the packaging at point-of-sale or in another manner reasonably calculated to fairly warn purchasers of the danger.

123.    Among other things, federal law required ADM to provide the following warning on its feeds containing monensin: "Do not allow horses or other equines access to feed containing monensin.  Ingestion of monensin by horses has been fatal."   21 CFR §558.355 (d)(6).

124.    The kinds of harm suffered by Plaintiffs and class members and their horses were foreseeable results of the defects in the Products.

125.    Neither Plaintiffs, nor any member of the class had any reason to know, prior to or at the time of purchase, or any time prior to the injuries to their horses, that the Products were defective and harmful.

126.    Plaintiffs and class members have been damaged as a result of the defects in the design and manufacture of the Products, and as a result of Defendants' failure to warn of these risks, in an amount to be proven at trial.

**Fifth Claim:**
**Unjust Enrichment**

127.    As a result of ADM's deceptive, fraudulent, and misleading labeling, advertising, marketing, and sale of the Products, ADM was enriched at the expense of Plaintiffs and class members through the payment of the purchase price, or for the payment of a price higher than otherwise would have been paid, for the Products, in addition to the potentially deadly health risks to horses that ingest contaminated ADM product.

128.    As a result of ADM's failure to warn about the presence and potential presence of monensin and about the dangers associated with monensin to horses on its products, ADM was enriched at the expense of Plaintiffs and class members through the payment of the purchase price, or for the payment of a price higher than otherwise would have been paid, for the Products.

129.    Under the circumstances, it would be against equity and good conscience to permit ADM to retain the ill-gotten benefits that it received from Plaintiffs and class members in light of the fact that the Products were not what ADM purported them to be.  As such, it would be unjust or inequitable for ADM to retain the benefit without restitution to Plaintiffs and class members for the monies paid to ADM for the Products.

**Sixth Claim:**
**Breach of Express Warranties**

130.    ADM provided Plaintiffs and class members with express warranties as outlined above.

131.    These affirmations of fact or promises relate to the Products and became part of the basis of the bargain.

132.    Plaintiffs and class members purchased the Products believing them to conform to the express warranties.

133.    ADM breached these warranties. This breach resulted in damages to Plaintiffs and class members, who bought the Products but did not receive them as warranted.

134.    As a proximate result of the breach of warranties, Plaintiffs and class members did not receive goods as warranted, and therefore have been injured and have suffered damages in an amount to be proven at trial. Among other things, Plaintiffs and class members did not receive the benefit of the bargain and have suffered other injuries as detailed above. Moreover, had Plaintiffs and class members known the true facts, they would not have purchased the Products or would have purchased them on different terms.

**Relief Sought**

Plaintiffs, for themselves and for the proposed class, request the following relief:

1.    Certification of the action as a class action under Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiffs as class representatives and their counsel as class counsel;

2.    A declaration that Defendants are financially responsible for notifying class members of the pendency of this suit;

3.    An order declaring Defendants' conduct to be in violation of applicable law and

enjoining Defendants from pursuing the unlawful acts and practices alleged herein by adequately disclosing the risks of monensin contamination in the Products, and the significance of that risk;

4.      An order requiring Defendants to remove its deceptive, false, and misleading statements from its website and other sources, and to engage in a corrective advertising campaign to inform consumers of the presence and potential presence of monensin in the Products and the deadly health effects to horses of ingesting monensin.

5.      An order requiring Defendants to modify their manufacturing processes to avoid the risk of monensin contamination in horse feed and nutritional supplements;

6.      An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Defendants as a result of the unfair, misleading, fraudulent, and unlawful conduct alleged herein;

7.      An order requiring Defendants to pay full restitution and actual, statutory, and punitive damages in an amount to be determined at trial, and where allowed by law;

8.      An order granting equitable relief in the form of restitution and disgorgement of all unlawful or illegal profits received by the Defendants as a result of the unlawful, unfair and deceptive conduct alleged herein;

9.      An order requiring Defendants to disgorge all ill-gotten gains flowing from the conduct alleged in this Complaint;

10.     An Order granting Plaintiffs their reasonable costs and attorneys' fees; and

11.     An Order granting such other further relief as may be just and proper.

**JURY TRIAL DEMAND**

Plaintiffs demand a jury trial for all individual and Class Claims so triable.

Dated: July 19, 2016

**Respectfully submitted,**

By: */s/ Patrick Muench*
Patrick Muench (ILSB #6290298)
Email: pmuench@baileyglasser.com
BAILEY & GLASSER, LLP
3930 N. Lowell Avenue
Chicago, IL 60641
Telephone: 217-528-1177, Ext. 1404
Fax: 217-528-1198

John W. Barrett
Email: jbarrett@baileyglasser.com
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-6555
Fax: (304) 342-1110

*Attorneys for Plaintiffs Beth Berarov and*
*Annelisa Bindra, and the Proposed Class*
*And Illinois Sub-Class*