# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

BETH BERAROV, and )
ANNELISA BINDRA, )
       )
    Plaintiffs, )
       )    No. 16 C 7355
    v. )
       )    Judge Jorge L. Alonso
ARCHERS-DANIELS-MIDLAND )
COMPANY, and ADM ALLIANCE )
NUTRITION, INC., )
       )
    Defendants. )

## MEMORANDUM OPINION AND ORDER

After plaintiffs' horses died from ingestion of monensin, plaintiff Beth Berarov ("Berarov") and Annelisa Bindra ("Bindra") filed against defendants Archer-Daniels-Midland Company and ADM Alliance Nutrition, Inc. ("ADM Alliance") (the manufacturer of the horse feed plaintiffs allege contained monensin) a six-count, purported class-action complaint asserting claims under the Illinois Food, Drug and Cosmetic Act and the Illinois Consumer Fraud and Deceptive Business Practices Act, as well as claims for negligent misrepresentation, product liability, unjust enrichment and breach of express warranty.[1] Defendants move to dismiss. For

---

[1] The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(d)(2). Plaintiffs have alleged that there are more than 100 class members, that the amount in controversy exceeds $5,000,000.00 and that "any member of a class of plaintiffs is a citizen of a State different from any defendants." *Id.* Plaintiffs have alleged that Archer-Daniels-Midland Company is a Delaware corporation with a principal place of business in Illinois and that ADM Alliance is an Illinois corporation with a principal place of business in Illinois. (Compl. ¶¶ 9-10). Plaintiffs have alleged that plaintiff Berarov is a citizen of Michigan and that plaintiff Bindra is a citizen of South Carolina. (Plaintiff's Jurisdictional Statement/Docket 42 at ¶¶ 4-5). The Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

the reasons set forth below, the Court grants in part and denies in part defendants' motion to dismiss [20].

## I.       BACKGROUND

The following facts are from plaintiffs' complaint, and the Court takes them as true.  In their complaint, plaintiffs refer to defendants collectively as ADM, so this Court will, as well.

Plaintiffs allege that defendant ADM Alliance (a subsidiary of defendant Archer-Daniels-Midland Company) is one of the world's largest manufacturers of animal feed.  ADM produces feed for both cattle and horses in the same facility, which is the crux of plaintiffs' complaint.  An ingredient—monensin—used in cattle feed to increase weight is poisonous to horses, and plaintiffs' allege that using the same manufacturing lines to produce both cattle and horse feed causes "an extraordinarily high, unacceptable, and undisclosed risk of cross-contamination to purchasers of [defendant's] horse feed products."  (Complt. ¶ 3).  Plaintiffs allege that the risk of cross-contamination from monensin can be reduced, but it cannot be eliminated unless a manufacturer uses facilities dedicated to equine feed.  Plaintiffs allege that the horse feeds ADM manufactures on the same lines as cattle feed (and that are, thus, at risk for cross-contamination with monensin) include:  GROSTRONG, JUNIORGLO, PRIMEGLO, SENIORGLO, POWERGLO, ULTRA-FIBER, PATRIOT, MOORGLO and HEALTHYGLO.

Monensin is toxic to humans, who must wear protective clothing and a respirator while using monensin.  For horses, ingestion of monensin can be fatal.  Plaintiffs allege that the amount of monensin horses can safely ingest is unclear, because controlled studies to determine the exact amount would kill horses and, thus, be unethical to conduct.  Horses who ingest too much monensin can experience colic, lack of coordination, tachycardia, kidney failure,

respiratory distress, paralysis and profuse sweating. There is no cure or antidote for a horse exposed to too much monensin.

Plaintiff Berarov lives in Michigan, where she operated Moonlyte Equestrian Center. For years, Berarov has purchased (and used exclusively) ADM feed products for her own thirteen horses and for the six other horses stabled at her center. She alleges she purchased ADM products contaminated with monensin for those horses. Specifically, in March 2015, Berarov noticed horses at her center becoming sick. She noticed them becoming tired with little exertion, that they were lethargic and that they suffered tachycardia. Berarov had the feed analyzed and learned that it was contaminated with monensin. Within a year, nine horses (eight of which were owned by Berarov) stabled at Berarov's equestrian center were euthanized due to symptoms caused by monensin. Post-mortem necropsy reports indicated those horses had suffered permanent cardiac and muscle damage from ingesting monensin.

Plaintiff Bindra lives in South Carolina. She purchased new and/or used ADM products contaminated with monensin for her horse, which she stabled in Beaumont, South Carolina. In December 2014, Bindra's horse showed signs of dehydration and colic after ingesting ADM Alliance 12% Pellets and Patriot Supreme Performance Horse Feeds. Two days later, Bindra's horse died. The stable owner sent the feed for testing and learned the ADM feed contained monsensin.

Plaintiffs allege that defendants have made "misleading, false, and deceptive statements in promotional materials and packaging" and "fail[ed] to disclose that the Products are manufactured" using a process that creates "an unacceptably high risk of monensin contamination." (Complt. ¶ 29). Plaintiffs allege that defendants have made the following statements on its website: (1) "ADM Alliance Nutrition offers consistent, high-quality feed

products . . . to help livestock producers achieve the greatest possible return from the grain and forage they utilize in livestock production[;]" (2) "Each ADM product is specifically created to help producers meet the nutritional demands of modern livestock while balancing environmental concerns[;]" (3) ADM's "FORAGE FIRST feeding programs . . . allow horses to perform at their best and with less risk of digestive and metabolic disorders associated with high-grain rations[;]" (4) "ADM Alliance Nutrition Equine Research is dedicated to developing the most effective equine feeding programs with the best value for horse owners[;]" (5) "Horse owners know that sound nutrition is one of the keys to longevity and performance[;]" (6) "ADM can deliver complete feeds, premixes or nutritional supplements—whatever makes the most sense for the family pleasure horse or the equine athlete[;]" and (7) "ADM offers a number of ingredients for the horse feed manufacturer that enable horses to live long and healthy lives." (Complt. ¶ 31).

Plaintiffs also allege that, in response to press reports about the death of Bindra's horse, ADM issued a press release. In it, ADM stated, "Generations of healthy, winning horses have shown that horse feed produced in multi-species facilities is safe." ADM went on to make statements about the amount of monensin horses can safely consume. Specifically, ADM stated:

> When monensin-treated cattle feed is manufactured in the same facilities as horse feed, trace residues of monensin can be found in the horse feed. These levels are far below levels that are harmful to horses. . . . Studies show that a 1000-pound horse can safely consume about 318 parts per million (ppm) in 30 pounds of feed. . . . At these levels, an average 1000-pound horse would have to eat 893 pounds of feed a day to consume a lethal level of monensin.

(Complt. ¶ 34).

Plaintiffs allege that when ADM made these statements, it knew its manufacturing process left an "unacceptably high risk of monensin contamination and equine death" and that purchasers did not know about the potential for cross-contamination with monensin. (Complt ¶ 39). Plaintiffs allege that defendants intended for consumers to rely on their false statements and

that plaintiffs did, in fact, rely on the statements to their detriment. Plaintiffs allege their reliance was reasonable, because reasonable consumers do not expect horse feed to contain monensin or to be manufactured using a process that creates an unacceptable risk of cross-contamination.

Based on these allegations, plaintiffs filed a complaint in which they assert the following claims: violation of the Illinois Food, Drug and Cosmetic Act (Count I), violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act (Count II), negligent misrepresentation (Count III), strict product liability (Count IV), unjust enrichment (Count V) and breach of express warranty (Count VI). Plaintiffs bring these claims on behalf of themselves and a class they define as "all persons who purchased ADM equine feeds and nutritional supplements within any applicable limitations period until notice is provided." (Complt. ¶ 87). Defendants move to dismiss.

## II.      STANDARD ON A MOTION TO DISMISS

The Court may dismiss a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure if the plaintiff fails "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Under the notice-pleading requirements of the Federal Rules of Civil Procedure, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint need not provide detailed factual allegations, but mere conclusions and a "formulaic recitation of the elements of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555. To survive a motion to dismiss, a claim must be plausible. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Allegations that are as consistent with lawful conduct as they are with unlawful conduct are not sufficient; rather, plaintiffs must include allegations that "nudg[e] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In considering a motion to dismiss, the Court accepts as true the factual allegations in the complaint and draws permissible inferences in favor of the plaintiff. *Boucher v. Finance Syst. of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018). Conclusory allegations "are not entitled to be assumed true," nor are legal conclusions. *Iqbal*, 556 U.S. at 680 & 681 (noting that a "legal conclusion" was "not entitled to the assumption of truth[;]" and rejecting, as conclusory, allegations that "'petitioners 'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement"). The notice-pleading rule "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-679.

## III. DISCUSSION

### A. Preemption

Defendants move to dismiss plaintiffs' entire complaint, arguing that it is preempted by regulations promulgated under the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq. The FDCA prohibits, among other things, delivering into interstate commerce any food or drug that is "adulterated." 21 U.S.C. § 331(a). A "drug" is "deemed to be adulterated" if "the facilities or controls used" for "its manufacture . . . do not conform" with "good manufacturing practice[.]" 21 U.S.C. § 351(a)(2)(B). A regulation titled "Current good manufacturing practice" and promulgated pursuant to 21 U.S.C. § 371 (giving authority to the Secretary to promulgate regulations under the FDCA) includes, as a drug under 21 U.S.C. §351(a)(2)(B), "a drug contained in medicated feed[.]" 21 C.F.R. § 225.1(a).

The regulations go on to state "[a]dequate procedures for all equipment used in the manufacture and distribution of mediated feeds are essential to maintain proper drug potency and avoid unsafe contamination of feeds with drugs." 21 C.F.R. § 225.65(a). The regulations add:

The steps used to prevent unsafe contamination of feeds shall include one or more of the following, or other equally effective procedures:

> (1) Such procedures shall, where appropriate, consist of physical means (vacuuming, sweeping, or washing), flushing, and/or sequential production of feeds.

> (2) If flushing is utilized, the flush material shall be properly identified, stored, and used in a manner to prevent unsafe contamination of feeds.

> (3) If sequential production of medicated feeds is utilized, it shall be on a predetermined basis designed to prevent unsafe contamination of feeds with residual drugs.

21 C.F.R. § 225.65(b)(1)-(3). Based on these regulations, defendants argue that plaintiffs' claims are preempted, because they are "obstacles" to accomplishing Congress' purpose.

Federal preemption is an affirmative defense. *Fifth Third Bank v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005). Plaintiffs need not plead around an affirmative defense, but the Court may dismiss on the basis of an affirmative defense, where plaintiffs allege, and thus admit, the elements of the affirmative defense. *Chicago Bldg Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613-14 (7th Cir. 2014); *United States Gypsum v. Indiana Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003).

The Supremacy Clause in the United States Constitution declares that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Law of any State to the Contrary notwithstanding." U.S. Const. Art. VI., cl. 2. Thus, "state laws that conflict with federal law are 'without effect.'" *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 479-80 (2013) (citing *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981); *McCulloch v. Maryland*, 4 L.Ed. 579 (1819)).

"Preemption fundamentally is a question of congressional intent." *English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990). It takes three forms. "First, Congress can define explicitly

the extent to which its enactments pre-empt state law." *English*, 496 U.S. at 78. Second, "state law is preempted where it regulates conduct in a field that Congress intended the federal government to occupy exclusively." *English*, 496 U.S. at 79. Third, "state law is preempted if it actually conflicts with federal law," either because "it is impossible for a private party to comply with both state and federal requirements," or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English*, 496 U.S. at 79 (citing *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

In this case, the Court considers that last form, implied preemption. Defendants do not argue that Congress explicitly preempted plaintiffs' claims. Rather, defendants argue that plaintiffs' claims are based on state law that stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. To determine whether plaintiffs' state claims conflict, the Court "examines the federal statute as a whole" to identify "its purpose and intended effects." *Aux Sable Liquid Products v. Murphy*, 526 F.3d 1028, 1034 (7th Cir. 2008). The Supreme Court has explained, though, that "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives,'" because "it is Congress rather than the courts that preempt state law." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (citations omitted). "[A] law must do 'major damage' to clear and substantial federal interests before the Supremacy Clause will demand that state law surrender to federal regulation." *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1050 (2013).

Defendants seem to be arguing that Congress's purpose with the FDCA is "uniformity" and to offer "a mix of choices" for avoiding cross-contamination in the manufacturing process. (Def. Brief at 6-7). The Court thinks this paints Congress's purpose with too fine a brush.

"Congress enacted the FDCA to bolster consumer protection against harmful products." *Wyeth v. Levine*, 555 U.S. 555, 574 (2009). The Court does not see a stricter state law as an obstacle to that purpose. *See Wyeth*, 555 U.S. at 578 ("it appears that the FDA traditionally regarded state law as a complementary form of drug regulation"); *Patriotic Veterans*, 736 F.3d at 1049 ("The fact that a state has more stringent regulations than a federal law does not constitute conflict preemption. Otherwise, every time a state chose to apply a more rigorous standard when regulating conduct within the state, the result would be impermissible. We know, however, that states frequently, and without preemption by federal law, create more stringent laws regarding minimum wage, employment discrimination, educational standards, gambling, and highway safety, to name a few.").

Defendants rely on *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861 (2000), but that case is different. "In *Geier*, the agency enacted a regulation deliberately allowing manufacturers to choose between different options because the agency wanted to encourage diversity in the industry . . . [and] to foster innovation." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 120 (2014). The regulation at issue in *Geier* concerned which passive restraints (meaning restraints such as airbags and automatic seat belts rather than manual restraints, such as ordinary lap and shoulder seat belts) to require car manufacturers to install. *Geier*, 529 U.S. at 878-80. The Supreme Court noted that the Department of Transportation had concluded that the real problem with automobile safety was that occupants failed to use their manual restraints (i.e, seatbelts), a danger passive restraints, including airbags, could not entirely overcome. *Geier*, 529 U.S. at 875-80. Because airbags were expensive, because the DOT was hoping more states would mandate the use of seatbelts and because DOT was hoping automobile manufacturers would develop other, safer passive restraints, DOT "deliberately sought a *gradual* phase-in of

passive restraints" and decided not to require all cars to include airbags.  *Geier*, 529 U.S. at 878-80.  Ultimately, the Supreme Court concluded that a state suit seeking to hold an automaker liable for failing to install an airbag was an obstacle to the agency's objective of promoting a mix of alternate passive restraints.  *Geier*, 529 U.S. at 886.  In this case, by contrast, the Congressional purpose is to protect consumers from adulterated food, and a stricter state law is not an obstacle to that purpose.  *See Lefaivre v. KV Pharmaceutical Co.*, 636 F.3d 935, 941 (8th Cir. 2011) (state-law claim for breach of warranty of merchantability not preempted by FDA's good manufacturing practices regulations, because it was not "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

Furthermore, "[i]f Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express preemption provision at some point during the FDCA's 70-year history."  *Wyeth*, 555 U.S. at 574.  It clearly knows how.  *See e.g.* 21 U.S.C. § 379r ("no State or political subdivision of a State may establish or continue in effect any requirement— . . . (2) that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter . . .").

Defendants have not shown that they are entitled to judgment on the pleadings with respect to their preemption affirmative defense, and their motion is denied as to preemption.

### B.    Illinois Food, Drug and Cosmetic Act

In Count I, plaintiffs seek relief under the Illinois Food, Drug and Cosmetic Act ("ILFDCA"), 410 ILCS § 620/1 et seq.  Defendants move to dismiss Count I on the grounds that the Illinois Food, Drug and Cosmetic Act does not provide a private right of action.

The Court agrees.  *See United Food and Commercial Works Unions and Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, Case No. 12 C 204, 2012 WL 3061859 at *3 (N.D. Ill.

July 26, 2012) ("the ILFDCA, and similar state statutes do not create a private right of action").

First, nothing in the text of the Act offers an explicit private right of action. Second, the Court does not think the Illinois Supreme Court would imply a private right of action, which it does only in the presence of four factors, among them that "implying a private right of action is necessary to provide an adequate remedy for violations of the statute." *Fisher v. Lexington Health Care, Inc.*, 188 Ill.2d 455, 460 (Ill. S.Ct. 1999). In *Fisher*, the Illinois Supreme Court declined to find an implied private right of action for retaliation against nursing home employees, because, among other things the "legislature provided a statutory framework to encourage reporting of violations and to punish retaliation," such that it was not "necessary to imply a private right of action for employees in order to effectuate the purposes of the Act." *Fisher*, 188 Ill.2d at 467. The same is true in this case, where the legislature, instead of including a private right of action, made violations a misdemeanor, gave state's attorneys the duty to bring proceedings when the "Director reports any violations of this Act," and gave the Director the power to seek injunctive relief. *See* 410 ILCS 620/4; 410 ILCS 620/5; 410 ILCS 620/7. Thus, this Court does not think the Illinois Supreme Court would imply a private right of action in the Illinois Food, Drug and Cosmetic Act. *See also Collins v. Bentz of Naperville*, Case No. 3-12-433, 2013 IL App (3d) 120443-U at *5) (Westlaw) (Ill. App. 3d June 14, 2013) ("there are available statutory remedies [under the ILFDCA] and an implied private right of action is not necessary").

Accordingly, the Court grants defendants' motion to dismiss Count I and dismisses Count I with prejudice.

### C.  Illinois Consumer Fraud Act

In Count II, plaintiffs seek relief under the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1 et seq.  To state a claim, plaintiffs must allege:  "(1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Avery v. State Farm Mut. Auto Ins. Co.*, 216 Ill. 2d 100, 180 (Ill. S.Ct. 2005).  Defendants move to dismiss Count II on the grounds that plaintiffs have failed to allege that the disputed transactions occurred primarily and substantially in Illinois.

The Illinois Supreme Court has concluded that "the General Assembly did not intend the Illinois Consumer Fraud Act to apply to fraudulent transactions which take place outside of Illinois." *Avery*, 216 Ill.2d at 185.  Thus, in order to state a claim, plaintiffs must allege facts indicating "the circumstances that relate to the disputed transactions occur[red] primarily and substantially in Illinois." *Avery*, 216 Ill.2d at 187.  In *Avery*, the Illinois Supreme Court rejected a nationwide class-action under the ICFA, explaining it was "insufficient" that "a scheme to defraud was 'disseminated' from [defendant's] headquarters[.]" *Avery*, 216 Ill.2d at 189.  The Illinois Supreme Court noted that, for example, the named plaintiff resided in Louisiana, garaged his car in Louisiana and had his car repaired in Louisiana, which meant "the overwhelming majority of the circumstances which relate[d] to [plaintiff's] and the other out-of-state plaintiffs' claims proceedings—the disputed transactions in this case—occurred outside of Illinois." *Avery*, 216 Ill.2d at 188.  Ultimately, the Illinois Supreme Court said "the out-of-state plaintiffs in this case have no cognizable cause of action under the Consumer Fraud Act." *Avery*, 216 Ill.2d at 188.  Plaintiffs have had better luck stating a claim under the ICFA, where they have alleged that

they signed contracts containing Illinois choice-of-law provisions, that the contracts were accepted in Illinois and that they sent their payments to defendants in Illinois. *Morrison v. YTB Intern., Inc.*, 649 F.3d 533, 537 (7th Cir. 2011).

The Court agrees that plaintiffs have not alleged that the disputed transactions occurred primarily and substantially in Illinois. Plaintiffs allege that defendants are headquartered in Illinois, but that does not suffice under *Avery*. *Avery*, 216 Ill.2d at 189. Plaintiffs allege that Bindra's horse consumed ADM products in South Carolina, where it died, and that Berarov's horses consumed ADM products in Michigan, where they died. Plaintiffs include no allegations as to where they purchased the products, how they paid for the products or where they were when they relied on the alleged misstatements. Accordingly, plaintiffs have not alleged that the disputed transactions occurred primarily and substantially in Illinois, and they have not stated a claim under the Illinois Consumer Fraud and Deceptive Trade Practices Act.

Defendants' motion to dismiss is granted as to Count II, and the Court dismisses Count II without prejudice.

### D. Strict product liability

In Count IV, plaintiffs seek to hold defendants liable on a strict product liability theory. Defendants do not seek to dismiss plaintiff Bindra's strict liability claim. They seek to dismiss only plaintiff Berarov's claim.

With respect to some, though not all, of plaintiffs' claims, defendants argue that a conflict of laws requires the Court to consider what law to apply. Defendants argue that a conflict of laws requires the Court to apply Michigan law to Berarov's strict product liability claim. A court sitting in diversity (which this Court is doing in this case) applies the choice-of-law-rules used by the state where the federal court in which the case was filed sits. *NewSpin Sports, LLC v. Arrow*

*Electronics, Inc.*, 910 F.3d 293, 300 (7th Cir. 2018). Under Illinois law, to determine what state's law to apply to tort claims, courts use the most-significant-relationship test, which is to say that "the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties." *Esser v. McIntyre*, 169 Ill.2d 292, 298 (Ill. S.Ct. 1996).

Defendants argue that with respect to plaintiff Berarov, the law of Michigan applies to her claim for strict product liability. The Court agrees that the facts as alleged in plaintiffs' complaint suggest Michigan law applies. Although plaintiffs do not allege where they purchased the feed, plaintiffs allege that it was in Michigan that Berarov's horses consumed the ADM feed laced with monensin and in Michigan that the horses died. The injury, then, occurred in Michigan. Plaintiffs have not alleged that Illinois has a more significant relationship with the occurrence or the parties, aside from the fact that defendants are headquartered here. Thus, the Court applies the default rule and concludes the law of the place of injury controls.

Defendants argue that Berarov's claim labeled "Strict Products Liability" should be dismissed, because Michigan law does not recognize a claim for strict product liability. *See Dow v. Rheem Mfg. Co.*, Case Nos. 09-13697 & 10-10753, 2012 WL 1621368 at *9 (E.D. Mich. May 9, 2012) ("The Michigan Supreme Court 'has repeatedly noted that manufacturers and sellers are not insurers, and they are not absolutely liable for any and all injuries sustained from the use of their products.'") (citations omitted). This argument is a non-starter. Plaintiffs need not plead legal theories; they need only plead plausible claims. *Hatmaker v. Memorial Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010). If Count IV states a claim, the fact that plaintiffs put the wrong label on it does not matter.

Under Michigan law, a "prima facie case for product liability, under either a negligence or warranty theory, requires proof of a causal relationship between the defect and the damage of which the plaintiff complains." *Mulholland v. DEC Int'l Corp.*, 443 N.W.2d 340, 349 (Mich. S.Ct. 1989). Plaintiffs have alleged as much, but the Michigan Product Liability Act also affects plaintiff's claim. Defendants point out two respects in which they believe Berarov's claim is not plausible under the statute.

First, the Michigan Product Liability Act states:

> In a product liability action brought against a manufacturer or seller for harm allegedly caused by a product, there is a rebuttable presumption that the manufacturer is not liable *if, at the time the specific unit of the product was sold or delivered to the initial purchaser or user, the aspect of the product that allegedly caused the harm . . . was in compliance with regulations or standards relevant to the event causing the death or injury promulgated by a federal or state agency responsible for reviewing the safety of the product.*

Mich. Comp. Law § 600.2946(4) (emphasis added). The italicized language sounds to this Court like an affirmative defense, because it sounds like the statute applies if defendant establishes that it was in compliance with regulations. The Court thinks the Supreme Court of Michigan would agree, because they have described similar language in § 600.2946(5) ("the manufacturer is not liable . . . if the drug was approved for safety and efficacy by the United States food and drug administration . . .") as a defense. *See Taylor v. Smithkline Beecham Corp.*, 658 N.W.2d 127, 131 (Mich. S.Ct. 2003) ("[A] manufacturer . . . that has been approved by the FDA has an absolute defense to a products liability claim if the drug and its labeling were in compliance with the FDA's approval . . ."). Because the Court interprets § 600.2964(4) as providing an affirmative defense, plaintiffs need not plead around it.[2]

---

[2] Defendants argue that an exhibit attached to their motion to dismiss establishes they were in compliance with federal regulations such that § 600.2946(4) applies to plaintiff's claim. The Court does not consider documents outside the pleadings on a motion to dismiss. Fed.R.Civ.P.

Next, defendants cite § 600.2946(2), which states:

> In a product liability action brought against a manufacturer or seller for harm allegedly caused by a production defect, the manufacturer is not liable *unless the plaintiff establishes* that the product was not reasonably safe at the time the specific unit of the product left the control of the manufacturer or seller and that . . . a technically feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users and without creating equal risk of harm to others.

Mich. Comp. Laws § 600.2946(2) (emphasis added). Unlike § 600.2946(4), which is phrased to indicate a defense, this section is phrased as facts a plaintiff must establish, i.e., as elements of a plaintiff's claim. The Court concludes that plaintiffs have plausibly alleged an alternative production practice: they allege defendants could produce the feed on a line dedicated to horse products. The Court does not, however, find in plaintiffs' complaint any allegations that the feed was not reasonably safe when it left ADM's control.

Accordingly, the Court agrees that plaintiff Berarov has not stated a claim for product liability in Count IV. The Court grants defendants' motion to dismiss Count IV as to plaintiff Berarov, and her Count IV is dismissed without prejudice.

### E. Negligent misrepresentation

In Count III, plaintiffs assert negligent misrepresentation, a tort with elements essentially the same as fraud, except the plaintiffs need not allege that defendants knew the statement was false. *Abazari v. Rosalind Franklin Univ. of Med. & Science*, 40 N.E.3d 264, 272 (Ill.App.Ct. 2nd Dist. 2015).

---

12(d). The document is not part of the pleadings, because plaintiffs did not refer to it in their complaint nor is it central to their claims. *See EEOC v. Concentra*, 496 F.3d 773, 778 (7th Cir. 2007). That defendants referred to their exhibit in the press release that plaintiffs attached to their complaint and that contained some of defendants' alleged misstatements does not make the exhibit part of the pleadings. Plaintiffs have not alleged that defendants' reference to the exhibit in defendants' press release was a misstatement, so the exhibit is not central to plaintiffs' claims.

Defendants move to dismiss this claim on the grounds that its statements are mere puffery, which are not actionable as fraud. *Avery*, 216 Ill.2d at 173-74. As the Illinois Supreme Court has explained, "'[p]uffing denotes the exaggerations reasonably to be expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined." *Avery*, 216 Ill.2d at 173. Thus, words such as "best" or "'high-quality,' 'expert workmanship,' 'custom quality,' 'perfect,' 'magnificent,' 'comfortable,' and 'picture perfect'" are puffery, not actionable as statements of fact. *Barbara Sales, Inc. v. Intel Corp.*, 227 Ill.2d 45, 73 (Ill. S.Ct. 2007). Another reason Illinois does not allow puffery as the basis for fraud or misrepresentation is that "no reasonable consumer would rely on such an implicit assertion as the sole basis for making a purchase." *Barbara Sales*, 227 Ill.2d at 74.

The Court agrees that some of the statements plaintiffs allege to be misrepresentations contain puffing. Nonetheless, plaintiffs include allegations of at least a couple statements that, according to plaintiffs' allegations, are actionable misrepresentations. For example, plaintiffs allege that ADM represented on its website that it offered "consistent" products, which plaintiffs allege to be false in that some of ADM's products were cross-contaminated with enough monensin to kill their horses. In addition, plaintiffs allege that, after the death of Bindra's horse, defendants issued a press release in which it stated both the amount of monensin a horse could safely consume and that their products contained less, i.e., only trace amounts. Plaintiffs allege that was false in that defendants' feed contained enough monensin to kill their horses.

Next, defendants argue that plaintiffs have not included sufficient allegations to make their allegation of reliance plausible. *See Roppo v. Travelers Comm. Ins. Co.*, 869 F.3d 568, 591 (7th Cir. 2017) (plaintiff's "complaint must allege facts which suggest she plausibly relied on defendants' alleged misrepresentations") (citing *Iqbal*, 556 U.S. at 678). Defendants point out

that plaintiffs have not alleged they actually read the alleged misrepresentations, and the Court agrees that without such allegations, a bare and conclusory allegation of reliance is not plausible. *See Chavez v. Church & Dwight Co., Inc.*, Case No. 17 C 1948, 2018 WL 2238191 at *11 (N.D. Ill. May 16, 2018) ("By failing to allege that he read the statements on [defendant's] website, there is no basis to conclude that [plaintiff] relied on them in purchasing [the product] or that they induced him to purchase the [product].").

Plaintiffs have not alleged a plausible claim for negligent misrepresentation. Accordingly, Count III is dismissed without prejudice.

### F.     Breach of express warranty

In Count VI, plaintiffs assert a claim for breach of express warranty. To state a claim for breach of express warranty under Illinois law, plaintiffs must allege: "(1) the seller made an affirmation of fact or promise; (2) relating to the goods; (3) which was part of the basis of the bargain; and (4) seller guaranteed that the goods would conform to the affirmation or promise." *Kmak v. Sorin Group Deutschland GmbH*, Case No. 17 CV 4759, 2017 WL 8199974 at *5 (N.D. Ill. Dec. 12, 2017).

Defendants argue that this claim should be dismissed for the same reasons as Count IV: that defendants' statements were puffery and that plaintiffs have not alleged they saw the statements before purchasing ADM feed. The Court agrees that puffery cannot form the basis of an express warranty. *Corwin v. Connecticut Valley Arms, Inc.*, 74 F. Supp.3d 883, 892 (N.D. Ill. 2014) ("Opinions that a product is 'premium' or 'perfect' do not generally create express warranties."). While the Court recognizes that some of the statements plaintiffs alleged to be misrepresentations contain non-actionable puffery, the Court has already concluded that plaintiffs have adequately alleged some actionable misstatements.

The problem with this claim, like the claim for fraudulent misrepresentation, is that plaintiffs have not alleged they ever saw the alleged misstatements or that the misrepresentations were made to them when they purchased the ADM feed. Thus, they have failed to allege plausibly that the misstatements were part of the basis of the bargain. *See Kmak*, 2017 WL 8199974 at *5 (dismissing claim for breach of express warranty where "[p]laintiff ha[d] not alleged that she reviewed any manufacturer documents—not even brochures or advertisements— prior to use, what more the purchase, of [the product]"); *Felley v. Singleton*, 705 N.E.2d 930, 934 (Ill. App. Ct. 2nd Dist. 1999) ("affirmations of fact made during a bargaining process regarding the sale of goods are presumed to be part of the basis of the bargain").

Plaintiffs have failed to allege a plausible claim for breach of express warranty. Defendants' motion to dismiss is granted as to Count VI, which is dismissed without prejudice.

### G.    Unjust enrichment

In Count V, plaintiffs seek relief for unjust enrichment. Plaintiffs allege that "[a]s a result of ADM's . . . sale of the Products, ADM was enriched at the expense of plaintiffs and class members through the payment of the purchase price . . ." (Complt. ¶ 127). Plaintiffs allege "it would be unjust or inequitable for ADM to retain the benefit without restitution to Plaintiffs and class members for the monies paid to ADM for the Products." (Complt. ¶ 129).

As defendants point out, under Illinois law, "recovery for unjust enrichment is unavailable where the conduct at issue is the subject of an express contract between the plaintiff and defendant." *Cohen v. American Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013). That is because unjust enrichment is an *equitable* claim based on an *implied* contract; "[i]f an express contract exists to govern the parties' conduct, then there is no room for an implied contract." *Cohen*, 735 F.3d at 615. As the Seventh Circuit explained in *Cohen*, parties can plead claims in

the alternative, but "the inconsistent-pleading option in this context is limited." *Cohen*, 735 F.3d at 615. "A plaintiff may plead as follows: (1) there is an express contract, and the defendant is liable for breach of it; and (2) if there is *not* an express contract, then the defendant is liable for unjustly enriching himself at my expense." *Cohen*, 735 F.3d at 615.

Plaintiffs argue that they have not incorporated any contract allegations into their unjust enrichment claim. Strictly speaking, that is true: plaintiffs did not incorporate by reference any contract allegations from other parts of their complaint into their unjust enrichment claim. Plaintiffs do, however, reference a contract for the sale of goods by alleging they paid a "purchase price" and by alleging defendants should not be allowed to retain "monies paid to ADM for the Products." As plaintiffs have alleged it, their unjust enrichment claim is not alleged in the alternative but, instead, is based on money paid in exchange for a product, i.e., on a contract for the sale of goods. *See* 810 ILCS 5/2-204 ("A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.").

Defendants' motion to dismiss is granted as to Count V, and Count V is dismissed without prejudice.

### H. Defendants' request to strike class allegations

Finally, defendants ask the Court to strike plaintiffs' class allegations, because defendants do not like plaintiffs' alleged class definition. Defendants are concerned that the class definition plaintiffs allege in their complaint—"all persons who purchased ADM equine feeds and nutritional supplements" during the class period—is overly broad and will inevitably include scores of individuals who were never injured by ADM equine feeds. The Court need not

concern itself with an appropriate class definition unless and until a party moves for class certification.  Defendants' request that class allegations be stricken is denied.

## IV.    CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part defendants' motion to dismiss [20].  The Court dismisses Count I with prejudice.  The Court dismisses Counts II, III, V and VI without prejudice.  The Court dismisses without prejudice plaintiff Berarov's Count IV.  Plaintiff Bindra's Count IV remains.

Plaintiffs are granted leave to file an amended complaint by February 22, 2019, should they so choose.  This case is set for a status hearing on March 12, 2019 at 9:30 a.m.


SO ORDERED.                                    ENTERED:   January 22, 2019


                                               _____
                                               JORGE L. ALONSO
                                               United States District Judge